**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**LUCIO M. PACHECO,**

                      **Plaintiff,**

      **v.**                            **Civil Action 2:19-cv-3083**
                                        **Judge Edmund A. Sargus, Jr.**
                                        **Magistrate Judge Kimberly A. Jolson**

**COMMISSIONER OF**
**SOCIAL SECURITY,**

                      **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Lucio M. Pacheco, brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB"). For the reasons set forth below, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors (Doc. 11) and **AFFIRM** the Commissioner's decision.

## I.     BACKGROUND

Plaintiff filed his application for DIB on January 11, 2011, alleging that he was disabled beginning October 26, 2009. (Tr. 335–41). After his application was denied initially and on reconsideration, the Administrative Law Judge (the "ALJ") held a hearing on October 18, 2012. (Tr. 114–53). On February 15, 2013, the ALJ issued a decision denying Plaintiff's application for benefits. (Tr. 188–201).

The Appeals Council remanded the case to the Administrative Law Judge in an order dated November 25, 2014. (Tr. 208–12). Another administrative hearing was held on April 9, 2015, (Tr. 48–113), and the ALJ issued an unfavorable decision on June 30, 2015. (Tr. 21–40). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision

of the Commissioner. (Tr. 1403). Plaintiff then filed a case in this Court. (*See* Southern District of Ohio, 2:16-cv-1056). On November 28, 2017, Judge Edmund A. Sargus, Jr. adopted the Undersigned's recommendation to remand the case back to the administrative level. (Tr. 1401).

A third administrative hearing was held on March 5, 2019. (Tr. 1211–47). After which, the ALJ issued an unfavorable decision. (Tr. 1177–1201).

In lieu of appealing to the Appeals Council, Plaintiff filed the instant case on July 16, 2019 (Doc. 1). The Commissioner filed the administrative record on September 23, 2019 (Doc. 8). Plaintiff filed his Statement of Errors (Doc. 11) on November 29, 2019, Defendant filed an Opposition (Doc. 12) on January 9, 2020, and Plaintiff filed a Reply on January 24, 2020 (Doc. 13). Thus, this matter is now ripe for consideration.

In her decision, the ALJ found that Plaintiff had not engaged in substantial gainful activity during his alleged closed period of disability from September 1, 2010 through November 3, 2015. (Tr. 1179). She found that Plaintiff suffers from the following severe impairments: obesity, degenerative disc disease of the lumbar spine, osteoarthritis of the left acromioclavicular joint, history of talofibular tear of the left ankle, left tibial tenosynovitis, and affective and anxiety-related disorders. (Tr. 1180). But the ALJ found that none of Plaintiff's impairments, either singly or in combination, met or medically equaled a listed impairment. (Tr. 1181).

### A. Relevant Medical Evidence

Plaintiff's statement of errors concerns his alleged physical impairments. The ALJ helpfully summarized the relevant evidence:

> By way of history with respect to the treatment record prior to the claimant's alleged closed period of disability, in October 2009, he reportedly was in a workplace accident and injured his back and left foot (Ex. 1F/13). The objective medical record shows relatively mild clinical findings and initial physical exams failed to document significant abnormalities following the workplace accident. Diagnostic imaging of his left foot showed dorsal soft tissue swelling overlying the

metatarsals with no evidence of an acute fracture or dislocation (Ex. 1F/19). A November 2009 magnetic resonance imaging (MRI) of his lumbar spine revealed only mild degenerative disc disease and a very mild disc bulge at the lumbar vertebrae level of L4/5, with mild narrowing of the neural foramen but no canal stenosis (Exs. 3F; 32F/27). Although February 2010 electrodiagnostic testing revealed LS radiculopathy (Exs. 6F/2 and 32F/5), one doctor noted that the clinical findings were "underwhelming for significant underlying pathoanatomy" (Ex. l0F/2). Immediately following the accident, the claimant had swelling and tenderness in the injured areas. However, he had normal strength, sensation, and motor skills in the lower extremities (Ex. 1F/6). October 2009 left foot x-rays revealed some soft tissue swelling but no evidence of acute fracture or dislocation (Exs. 1F/19 and 2F/4). In January 2010, he was on restricted work duty, but examination results were fairly normal with no radicular symptoms or bowel or bladder dysfunction (Ex. 5F/3). He reportedly engaged in physical therapy through a chiropractor prior to the amended alleged disability onset date (Ex. 14F/1).

Around the time of the claimant's amended alleged disability onset date, in September 2010, he reported throbbing back pain that radiated to his left leg and a physical examination revealed positive straight-leg-raising on the left, but there was normal muscle strength in the lower extremities, grossly intact sensation and reflex function, and abilities to dorsiflex the great toes, stand up on his toes, stand back on his heels, squat down and return to a standing position, and ambulate without an antalgic gait (Ex. 13F/4). In October 2010, he was able to walk on his heels and toes and rise to a step without evidence of motor deficits in the lower limbs, and manual motor testing revealed full strength, though there was diffuse tenderness to palpation and somewhat blunted sensation in an L5 and Sl distribution on the left (Ex. 14F/11). In November 2010, he received a lumbar steroid injection (Exhibits 14F at 9; l5F at 7) and reported a substantial reduction in symptom intensity level (Exhibit 14F at 6), though he also had reported left ankle instability, impingement, and peroneal tendon pain (Ex. 15F/2). On exam, he had a normal gait and posture and had full strength in the lower extremities despite blunted sensation at the L5-Sl level (Ex. 14F/6). Another examination revealed tenderness along the ligaments and peroneal tendons and decreased proprioception but intact motor and sensory function with no deformity (Ex. 15F/2).

In 2011, MRis of the claimant's right ankle showed a torn talofibular ligament and low-grade posterior tibial tenosynovitis (Exhibits 18F at 1; 22F at 2; and 32F at 26). A March 2011 treatment note indicated electric muscle stimulation, massage, and ultrasound treatments (Exs. 19F/4; 21F), and an MRI of his left ankle revealed suspected chronic high-grade partial or full thickness tear of the anterior talotibular ligament and low-grade posterior tibial tenosynovitis (Exs. 18F and 32F/26). The record does not document significant treatment for the right ankle condition since June 2011. In June 2011, orthopedist Jeffrey Gittins, D.O., recommended left ankle arthroscopy (Exs. 22F/2; 23F; and 26F/2), and a physical examination revealed full range of motion of the upper extremities without restrictions, though the claimant

complained of some numbness down his left leg (Ex. 22F/1). A consultative psychologist observed a normal gait and upright posture (Ex. 24F/10).

The claimant has received physical therapy, chiropractic treatment, and lumbar epidural injections yet denied any improvement (Exs. 17F and 19F). Previously, however, he had reported substantial reduction in symptom intensity following lumbar epidural injections. Additionally, he previously reported a positive response to physical therapy and that he was tolerating light duty much better following treatment (Ex. 17F/39, 65). In January 2012, straight- leg-raising test results were positive on the left, sensation was decreased over the lower left leg, and there was decreased strength on left great toe dorsiflexion, but he could come up on his toes, back on his heels, squat, and return to standing with some difficulty (Ex. 40F). February 2012 electrodiagnostic testing revealed evidence of L5 motor radiculopathy with denervation involving the left lower limb but no lumbosacral plexopathy, peripheral entrapment neuropathy, peripheral polyneuropathy, or myopathy (Ex. 32F/5). In April 2012, a lumbosacral epidural steroid injection was administered (Ex. 32F/8), and February, March, and April 2012 physical examinations revealed that he was in no acute distress and had a normal gait and station and no lumbar spine tenderness on palpation, though lumbar flexion was decreased and painful and there was a positive straight-leg-raising test result (Ex. 32F/10, 11, 14, 17). In November 2012, he was in no apparent distress but had mildly to moderately decreased range of motion of the ankle (Exhibit 34F at 8). Left shoulder x-rays revealed moderate degenerative changes of the acromioclavicular joint (Ex. 39F/26).

In February 2013, the claimant presented for follow up regarding lower back and left ankle pain but was in no apparent distress (Ex. 34F/1, 2). He acknowledged that MS Contin was helping his symptoms but not enough. Treatment records continued to consistently document that he was in no acute distress (Ex. 39F). In May 2013, he had an antalgic gait but intact sensation and grossly normal motor function (Ex. 38F/46). In June, July, August, October, and December 2013, and January, February, March, April, May, and June 2014, he reported constant, aching lumbar spine pain but had a normal gait without obvious pain, intact sensation without focal deficit, and grossly normal motor function (Ex. 38F/17, 19, 21, 23, 25, 30, 32, 34, 36, 40, 42, 44). In February and September 2014, he received lumbar facet joint injections (Exhibit 38F at 7, 29).

In September 2014, he had a body mass index (BMI) of 32.57 (Ex. 38F/30). In July, August, October and December 2014, he described burning, stabbing, or aching pain, but he was observed to be in no acute distress and had intact sensory function and normal motor strength in all extremities (Ex. 38F/1, 3, 13, and 15).

A January 2015 treatment note indicated that the claimant was advised to stop smoking and to exercise regularly, and he was awaiting approval for a lumbar spine injection (Ex. 39F/2), which he testified that he received, resulting in substantial improvement in his condition such that he eventually returned to fulltime work

activity. There is no record of treatment of any nature since January 2015 until October 2017 (Ex. 42F/31 ). In January 2018, he again received lumbar epidural steroid injections (Ex. 42F). A January 2018 MRI of his lumbar spine revealed a disc protrusion abutting the exiting left L4 nerve root but no spinal stenosis (Ex. 42F/14, 15). He ambulated with a normal, non-antalgic gait without the use of assistive device, and he had normal muscle tone, range of motion, motor strength, and sensation (Ex. 42F/l7).

(Tr. 1186–87).

### B.    The ALJ's Decision

In formulating Plaintiff's residual functional capacity ("RFC"), the ALJ considered a number of treating source opinions:

In December 2011, treating physiatrist Paul Oppenheimer, M.D., opined that the claimant could not lift greater than ten pounds and needed to remain off his feet at all times until he received treatment for radiculopathy and left foot and ankle conditions (Ex. 33F). Dr. Oppenheimer noted diminished sensation, positive straight-leg-raising test results, and possible muscle wasting on the left side. Similarly, in June 2012, treating orthopedist Jimmy Henry, M.D., assessed a functional capacity for a reduced range of sedentary work with only occasional lifting and carrying of up to ten pounds, a need to change positions every 20 minutes, and an inability to reach below his knees, squat, kneel, or lift above his shoulders (Exs. 29F; 32F/2).

While normally controlling weight would be given to an opinion of disability from a treating physician, it is not so entitled if it is not well-supported by medically acceptable clinical or laboratory diagnostic techniques and is inconsistent with other substantial evidence of record (20 CFR 404.1527(c)(2)). The opinions of Dr. Oppenheimer and Dr. Henry are not entitled to controlling weight, as they are not well-supported by the above-summarize clinical and diagnostic evidence and are inconsistent with the other summarized substantial evidence of record. Rather, I give only partial weight to the assessments of Dr. Oppenheimer and Dr. Henry. While the record documented some positive findings, as noted by the doctors, and supported a limitation to sedentary work, the relatively minimal longitudinal objective findings did not support a need for the claimant to remain off his feet at all times or change positions every 20 minutes, or that he had the suggested extreme limitations with respect to reaching, squatting, kneeling, or lifting above the shoulders. Again, as summarized, the record documents inconsistent findings and evidence of exaggerated reports of pain that were contrary to examination findings that noted no acute distress. Also, as summarized, the record documents inconsistent reports regarding activities of living, suggesting that the claimant was more functional than alleged. Moreover, Dr. Oppenheimer was the only source to suggest atrophy, for which he provided no measurements in support. He also

indicated that sitting and supine positions caused pain on the claimant's left side, but he did not specify that it was radicular pain rather than back pain. On the date of his assessment, his treatment note of that same date cited no objective findings to show that he even completed a physical exam to support the limits described in his assessment (Ex. 32F/9). Dr. Oppenheimer had elsewhere also indicated that he had issued a handicapped placard to the claimant (Ex. 32F/48), but I give no weight to that, as a handicapped placard has no relationship to the evaluation of federal disability and would not appear to be inconsistent with an ability to perform sedentary work.

For the same reasons, I give little weight to the July 2012 assessment of treating neurologist Robert Hess, M.D., who opined that, at best, the claimant would have difficulty doing sedentary work, could lift five pounds once or twice each day, stand, at best, 20 minutes out of every two hours, and sit, at best, two hours in an eight-hour day (Ex. 30F). Dr. Hess later suggested that the claimant was permanently and totally disabled (Ex. 31F/8), but the question of disability is a matter reserved for the Commissioner (20 CFR 404.1527(d)). I note that Dr. Kendrick's assessment was much more recent and was based on a greater longitudinal perspective of the claimant's condition than the assessments of Dr. Oppenheimer, Dr. Henry, and Dr. Hess.

While the record documents findings supportive of a limitation to sedentary work, it does not support the extreme limitations suggested by Dr. Hess. For example, Dr. Hess found an inability to heel or toe walk, which other physicians found that the claimant could perform (for example, see Ex. 32F/11). Dr. Hess found significant weakness, yet that finding is also not consistently supported in the record (Ex. 32F/11). Nevertheless, I give some weight to this assessment, and other exams that did perceive some weakness and/or sensory loss, in finding that the claimant was limited to sedentary range of work despite general lack of objective evidence to support that degree of limitation. Dr. Hess opined that, at best, the claimant could stand/walk occasionally which is up to 1/3 of the workday and not inconsistent with an ability to perform at least sedentary work. However, the record documents nothing significantly wrong with the claimant's upper extremities other than moderate AC joint osteoarthritis, which did not reasonably result in a lifting limitation to only five pounds.

(Tr. 1190–91).

After reviewing the medical record and opinion evidence, the ALJ analyzed Plaintiff's

RFC, concluding that:

During his alleged closed period of disability from September 1, 2010, to November 22, 2010, the claimant had the residual functional capacity (RFC) to perform sedentary work as defined in 20 CFR 404.1567(a) except he could have stood and/or walked 45 minutes at a time for up to two hours in a workday. With

respect to his left upper extremity, he could have occasionally reached overhead and frequently reached in other directions, pushed, and pulled. He could have occasionally operated foot controls with his left lower extremity. He could have occasionally balanced, stooped, kneeled, crouched, and crawled, and occasionally climbed ramps and stairs, but he could not have climbed ladders, ropes, or scaffolds. He could have been occasionally exposed to vibration. He needed to avoid work around hazards such as unprotected heights and work in proximity to exposed moving mechanical parts. He required a single work location and could have worked within several workstations in the same building, but not have traveled. He could have performed routine tasks with few changes in the nature of the tasks that were explained.

Medical improvement occurred such that since November 13, 2015, the claimant has been able to perform work of light exertion with standing and/or walking of 45 minutes at a time for up to two hours in a workday. With respect to his left upper extremity, he can occasionally reach overhead and frequently reach in other directions, push, and pull. He can occasionally operate foot controls with his left lower extremity. He can occasionally balance, stoop, kneel, crouch, and crawl, and occasionally climb ramps and stairs, but he cannot climb ladders, ropes, or scaffolds. He can occasionally be exposed to vibration. He needs to avoid work around hazards such as unprotected heights and work in proximity to exposed moving mechanical parts. He has no mental work-related limitations.

(Tr. 1184). She found that:

[a]fter careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause at least some of the alleged symptoms; however, his statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

(Tr. 1185).

The ALJ, therefore, determined that:

[d]uring his alleged closed period of disability, the claimant was unable to perform his past relevant work. Since November 13, 2015, he has been able to perform his past relevant work as an auto parts assembler as actually performed and his past relevant work as a lens assembler as actually performed and as generally performed in the national economy.

(Tr. 1198 (internal citation omitted)). She also found that, during Plaintiff's period of closed disability, "he was capable of making a successful adjustment to other work that existed in

significant numbers in the national economy … and since the end of his alleged closed period of disability has been capable of performing his past relevant work and a significant number of other jobs in the national economy."  (Tr. 1200).

## II.    STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards."  *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court."  *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)).  If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently."  *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

## III.    DISCUSSION

Plaintiff contends that the ALJ's decision should be reversed because the ALJ erred by "discredit[ing] the vast majority of opinion evidence including multiple treating source opinions in favor of the non-examining doctor who appeared at the second of three hearings that Mr.

Pacheco attended." (Doc. 11 at 8). According to him, the ALJ improperly weighed the testimony of his treating source providers, Dr. Oppenheimer, Dr. Hess, and Dr. Henry. (*Id.* at 8–14).

Two related rules govern how the ALJ was required to analyze the opinion of Drs. Oppenheimer, Henry, and Hess. *See Dixon v. Comm'r of Soc. Sec.*, No. 3:14-cv-478, 2016 WL 860695, at *4 (S.D. Ohio Mar. 7, 2016). The first is the "treating physician rule." *Id.* The rule requires an ALJ to "give controlling weight to a treating source's opinion on the issue(s) of the nature and severity of the claimant's impairment(s) if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record." *LaRiccia v. Comm'r of Soc. Sec.*, 549 F. App'x 377, 384 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted).

Closely associated is "the good reasons rule," which requires an ALJ always to give "good reasons . . . for the weight given to the claimant's treating source opinion." *Dixon*, 2016 WL 860695, at *4 (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (alterations in original)); 20 C.F.R. § 404.1527(c)(2). In order to meet the "good reasons" standard, the ALJ's determination "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011).

> The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied. The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.

*Wilson*, 378 F.3d at 544 (internal citation and quotation marks omitted). The treating physician rule and the good reasons rule together create what has been referred to as the "two-step analysis

created by the Sixth Circuit." *Allums v. Comm'r of Soc. Sec.*, 975 F. Supp. 2d 823, 832 (N.D. Ohio 2013).

On December 1, 2011, Dr. Oppenheimer completed a treating source statement in which he opined that Plaintiff was "absolutely not capable of substantial and gainful employment activity until he receives appropriate treatment for his left foot and ankle conditions." (Tr. 913). In formulating his opinion, Dr. Oppenheimer reviewed a report from Plaintiff's foot and ankle specialist and performed a clinical evaluation of his own. (*Id.*). He concluded that Plaintiff could not "lift greater than ten pounds at one time and must remain off his feet at all times to prevent a worsening in his condition." (*Id.*).

Similarly, on June 20, 2012, Dr. Henry completed a Bureau of Workers' Compensation Physician's Report of Work Ability in which he opined that Plaintiff could occasionally: lift up to ten pounds, bend, twist/turn, stand/walk, and sit. (Tr. 844). He further indicated that Plaintiff could never: reach below the knee, squat/kneel, or lift above the shoulders. (*Id.*). Dr. Henry concluded that Plaintiff would need frequent positional changes due to lower back and left leg pain. (*Id.*). In his view, these restrictions were permanent. (*Id.*).

Finally, on July 5, 2012, Dr. Hess issued an opinion of his own. (Tr. 845–46). Based on his examination, he concluded that Plaintiff would "have difficulty doing sedentary work according to the code of Federal Regulations." (Tr. 846). Dr. Hess limited Plaintiff to lifting five pounds "once or twice each day," standing for 20 minutes every two hours, and sitting for two hours in an eight-hour day. (*Id.*). Further, he found that "certain amounts of walking cannot be met by his ability at the present time" and limited Plaintiff to occasional standing and walking. (*Id.*).

Reviewing Dr. Oppenheimer's and Dr. Henry's opinions together, the ALJ found that they were "not entitled to controlling weight" because they were "not supported by the … clinical and diagnostic evidence and [were] inconsistent with the other … substantial evidence of record."  (Tr. 1190).  She, therefore, gave them "partial weight":

> While the record documented some positive findings, as noted by the doctors, and supported a limitation to sedentary work, the relatively minimal longitudinal objective findings did not support a need for the claimant to remain off his feet at all times or change positions every 20 minutes, or that he had the suggested extreme limitations with respect to reaching, squatting, kneeling, or lifting above the shoulders. Again, as summarized, the record documents inconsistent findings and evidence of exaggerated reports of pain that were contrary to examination findings that noted no acute distress. Also, as summarized, the record documents inconsistent reports regarding activities of living, suggesting that the claimant was more functional than alleged.

(*Id.*).  The ALJ further explained her decision to discount the opinion of Dr. Oppenheimer:

> Dr. Oppenheimer was the only source to suggest atrophy, for which he provided no measurements in support. He also indicated that sitting and supine positions caused pain on the claimant's left side, but he did not specify that it was radicular pain rather than back pain. On the date of his assessment, his treatment note of that same date cited no objective findings to show that he even completed a physical exam to support the limits described in his assessment (Ex. 32F/9). Dr. Oppenheimer had elsewhere also indicated that he had issued a handicapped placard to the claimant (Ex. 32F/48), but I give no weight to that, as a handicapped placard has no relationship to the evaluation of federal disability and would not appear to be inconsistent with an ability to perform sedentary work.

(*Id.*).

"For the same reasons," the ALJ gave "little weight" to the opinion of Dr. Hess.  (*Id.*).  She provided several examples contrasting Dr. Hess' findings with the objective medical record:

> Dr. Hess found an inability to heel or toe walk, which other physicians found that the claimant could perform (for example, see Ex. 32F/11).  Dr. Hess found significant weakness, yet that finding is also not consistently supported in the record (Ex. 32F/11).  Nevertheless, I give some weight to this assessment, and other exams that did perceive some weakness and/or sensory loss, in finding that the claimant was limited to sedentary range of work despite general lack of objective evidence to support that degree of limitation.  Dr. Hess opined that, at best, the claimant could stand/walk occasionally which is up to 1/3 of the workday and not inconsistent with

an ability to perform at least sedentary work. However, the record documents nothing significantly wrong with the claimant's upper extremities other than moderate AC joint osteoarthritis, which did not reasonably result in a lifting limitation to only five pounds.

(Tr. 1191).

Plaintiff challenges this analysis on multiple grounds. First, he contends, the ALJ inappropriately relied on the opinion of a non-treating source to discredit the opinions of Drs. Oppenheimer, Henry, and Hess. (Doc. 11 at 11). Plaintiff is correct that Sixth Circuit precedent makes clear that relying only on the opinion of a non-treating source to discredit the opinion of a treating source is inappropriate. *See Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 377 (6th Cir. 2013) ("[T]he ALJ does not identify the substantial evidence that is purportedly inconsistent with Dr. Onady's opinions. Surely the conflicting substantial evidence must consist of more than the medical opinions of the nontreating and nonexamining doctors. Otherwise the treating-physician rule would have no practical force because the treating source's opinion would have controlling weight only when the other sources agreed with that opinion. Such a rule would turn on its head the regulation's presumption of giving greater weight to treating sources because the weight of such sources would hinge on their consistency with nontreating, nonexamining sources.").

But that is not what occurred here. True, at various points in her decision analyzing the opinions of Plaintiff's treating physicians, the ALJ referenced the opinion of Dr. Robert Kendrick, "the impartial medical expert" who provided testimony at the April 2015 hearing. (Tr. 1190–91). She found that Dr. Kendrick's opinion was entitled to "significant weight" because of: his specialization in orthopedic surgery; his "access to a lengthy treatment record"; the fact that his findings were supported by objective clinical, diagnostic and laboratory findings; and his experience as an expert witness before the Social Security Administration. (Tr. 1189). She further noted that "Dr. Kendrick's assessment was much more recent and was based on a greater

longitudinal perspective of the claimant's condition than the assessments of" Plaintiff's treating physicians. (Tr. 1191).

In discrediting the opinions of Plaintiff's treating physicians, however, the ALJ consistently cited the discrepancies between the objective medical record and their opinions. The relevant regulations make clear that this is an appropriate way to discredit the opinion of a treating source. *See* 20 C.F.R. § 404.1527(c)(2). And because the ALJ did not rely solely on the opinion of a non-treating source to discredit the opinions of Oppenheimer, Henry, and Hess, the Undersigned finds no fault with the ALJ's analysis on this ground. *Cf. Gayheart*, 710 F.3d at 377 ("Surely the conflicting substantial evidence must consist of more than the medical opinions of the nontreating and nonexamining doctors.").

Second, Plaintiff argues that the ALJ offered only a "conclusory declaration" to support her conclusion that the opinions of Drs. Oppenheimer, Henry, and Hess were not entitled to controlling weight because they were inconsistent with the record. (Doc. 11 at 11).

Again, the Undersigned disagrees. As the ALJ explained at length, their opinions were inconsistent with the clinical evidence and the record as a whole. The ALJ's summary of the record demonstrates as much. *Cf. Hughes v. Comm'r of Soc. Sec.*, No. 18-11168, 2019 WL 2950080, at *2 (E.D. Mich. July 9, 2019) (quoting *Vitale v. Comm'r of Soc. Sec.*, No. 16-12654, 2017 WL 4296608, at *2, 2017 U.S. Dist. LEXIS 159500, at *5 (E.D. Mich. Sept. 28, 2017)) ("[I]t is proper for the Court to read the ALJ's assessment of the treating physician's opinion 'together with the ALJ's decision as a whole.'"). While Drs. Oppenheimer, Henry, and Hess opined that Plaintiff was incapable of substantial gainful activity, (Tr. 844, 845–46, 913), the objective medical record consistently reflects mild clinical findings, relatively normal exam results, and no acute distress or loss of motor function or muscle strength, (Tr. 1186–88). Further, the record shows

that multiple independent medical examiners found that the Plaintiff displayed inconsistent and exaggerated behavior upon physical examination and that his subjective complaints were vague and diffuse. (Tr. 1192). Given the inconsistencies between the medical record and the opinions of Drs. Oppenheimer, Henry, and Hess, the ALJ did not err in finding that they were entitled to partial weight. *See Price v. Comm'r of Soc. Sec.*, 342 F. App'x 172, 175–76 (6th Cir. 2009) ("Where the opinion of a treating physician is not supported by objective evidence or is inconsistent with the other medical evidence in the record, this Court generally will uphold an ALJ's decision to discount that opinion.").

Finally, Plaintiff contends, "[t]he ALJ's classification of the record as inconsistent with the treating source opinions is simply incorrect." (Doc. 11 at 11–14). And Plaintiff has done an admirable job of collecting citations to the record that support this conclusion. (*Id.*). A fair reading of the record, however, makes clear that the ALJ's conclusion was supported by substantial evidence. During the relevant time period, the objective medical record reflects mild clinical findings, relatively normal exam results, and no acute distress or loss of motor function or muscle strength. (*See* Tr. 1186–88). This is "relevant evidence" that "a reasonable mind might accept as adequate to support a conclusion." *Rogers*, 486 F.3d at 241 (citation and quotations omitted). And, if the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)). In other words, "if substantial evidence supports the [Commissioner's] decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

In sum, the ALJ thoroughly reviewed the medical record and concluded that the opinions of Plaintiff's treating physicians were inconsistent with the objective evidence and other substantial evidence in the record. That decision was consistent with the regulations. And while Plaintiff has cited evidence contradicting the ALJ's conclusion, there was more than sufficient evidence from which the ALJ could conclude that Plaintiff was capable of engaging in substantial gainful activity and, therefore, not disabled.

## IV. CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors (Doc. 11) and **AFFIRM** the Commissioner's decision.

## V. PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of

the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.


Date:   February 26, 2020                    /s/ Kimberly A. Jolson
                                             KIMBERLY A. JOLSON
                                             UNITED STATES MAGISTRATE JUDGE